IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| FASTENER CORPORATION OF AMERICA, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 1:12-CV-1296 |
| ASHEBORO ELASTICS CORP., ET AL., | ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Catherine C. Eagles, District Judge.

The plaintiff, Fastener Corporation of America ("FCA"), filed suit in Davie County Superior Court alleging that defendant Telas Elásticas, S. de R.L. ("TESA") breached a broker's agreement with FCA after FCA successfully arranged a sale of TESA to defendant Asheboro Elastics Corp. ("AEC"). FCA alleges that defendants AEC and Telas Elásticas Adquisición Sociedad de Responsabilidad Limitada ("TESA Acquisitions") are also liable for TESA's breach because TESA Acquisitions agreed to assume TESA's liabilities under the Purchase Agreement and because AEC's assertion of complete ownership and control of TESA Acquisitions renders it liable under the doctrine of piercing the corporate veil. (Doc. 7 at ¶¶ 20-21.) The defendants removed the case to this Court and filed motions to compel arbitration and to dismiss. (Docs. 16 and 18.) FCA filed a motion to remand. (Doc. 26.) The motion to compel arbitration will be granted because FCA is equitably estopped from avoiding the arbitration provision in the Purchase Agreement. Consequently, the motion to remand will be denied because this Court has

federal question jurisdiction under 9 U.S.C. § 201 *et seq.*, and the motion to dismiss will be left for the arbitrators to decide.

There are a number of things the parties agree about, and the Court will set those out without further citation to or discussion of the legal principles involved. The parties agree that this Court has jurisdiction to decide the motion to compel arbitration pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, as implemented by the Federal Arbitration Act and codified at 9 U.S.C. § 201 *et seq.* The parties agree that if the motion to compel arbitration is granted, then the motion to remand should be denied and the motion to dismiss should be decided by the arbitrators. The parties agree that if the motion to compel arbitration is denied, the Court must decide the fraudulent joinder issue in the motion to remand.

## FACTS

The following facts are undisputed for purposes of these motions. In the spring of 2011, TESA asked FCA if it would solicit potential buyers for TESA's business. (Doc. 7 at ¶ 6.) On April 15, 2011, TESA and FCA entered into a 90-day contract ("April Contract"), under which FCA agreed to promote the sale of TESA to a list of three specific corporations that did not include defendant AEC or any other defendant. (*Id.* at ¶ 7.) TESA agreed to pay FCA a 10-percent commission if a sale was completed. (Doc. 20-1 at 5.) This contract was in writing and contained an agreement to arbitrate any "disputes or disagreements in the interpretation, compliance and performance" of the contract. (*Id.* at 9.) The contract also contained a provision that it could only be extended in writing. (*Id.*)

The April Contract expired with no sale, (Doc. 7 at ¶ 8), and there is no evidence FCA continued its efforts to sell TESA to any of the three named potential purchasers or anyone else. Neither party sought to extend the contract, and it was not extended.

2

About three months after the April Contract expired, TESA's general manager and president, Victor Wilson, sent an email to Charles Mays, the president of FCA, offering FCA a 5-percent commission if FCA promoted the sale of TESA to AEC. (Doc. 7 at ¶ 8; Doc. 20-2.) Mr. Wilson was in Honduras and Mr. Mays was in North Carolina. From the language of the email, one would infer that there had been some conversations between Mr. Wilson and Mr. Mays about this beforehand, (*see* Doc. 20-2), but there is no evidence before the Court about any such conversations. The email stated in its entirety:

> charley, [sic]
> By way of this email, I confirm that you are authorized to work with Raul Castillo in approaching Ashboro [sic], PROVIDED YOU PROVIDED [sic] CONFIRMATION OF THE FOLLOWING:
>    1. Your comission [sic] rate is reduced from the precious [sic] contractual 10% to 5%.
>    2. Expenses remain for your account unless otherwise approved.
>    3. You will coordinate your actions with myself and Raul Castillo.
> Please provide confirmation for the following to Martha Arquijo in a manner agreeable to her.
> Thanks,
> VW

(*Id.*)

By return email, Mr. Mays accepted on FCA's behalf. (*Id.*) His response stated in its entirety:

> Victor,
> Agreed to each point as of Wednesday Oct 26.
> As stated in below email FCA will comply.
> I need Mr. Castillo's contact information to coordinate with him.
> Thanks and best regards to all,
> Charles Mays
> President
> FCA

(*Id.*)

3

Neither email mentioned arbitration and neither explicitly adopted or incorporated the terms of the April Contract. As noted *supra*, Mr. Wilson's email did reference the reduction of the commission "from the precious [sic] contractual 10% to 5%." (*Id.*)

On April 20, 2012, TESA's shareholders sold 80 percent of TESA's stock to TESA Acquisitions, a Honduran entity formed by AEC for the purpose of buying TESA's stock, for $1.00. (Doc. 20-3 at 5.) TESA Acquisitions also received an option to purchase the remaining 20 percent of TESA's shares for $150,000 if and when certain conditions were met. (*Id.*) The Purchase Agreement between TESA and TESA Acquisitions contained an arbitration provision. (*Id.* at 14.) The parties agree that this transaction gave rise to a commission under the October agreement between TESA and FCA, though the terms and conditions of that contract and its form, as well as the amount of the commission due, are disputed.

## ANALYSIS

### A. The Motion to Compel Arbitration

Courts favor arbitration and interpret arbitration provisions broadly, especially in the international context. *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985). However, a party cannot be required to arbitrate a dispute that it has not agreed to submit to arbitration. *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986). "The burden of proving an agreement to arbitrate rests upon the party seeking arbitration." *Silkworm Screen Printers, Inc. v. Abrams*, 978 F.2d 1256 (table), 1992 WL 317187, at *3 (4th Cir. Nov. 4, 1992). The law is well-settled as to what a party moving to compel arbitration must show:

> To state a claim to compel arbitration under the [Federal Arbitration Act], [a party] must allege (1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the

4

agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of [the opposing party] to arbitrate the dispute.

*Whiteside v. Teltech Corp.*, 940 F.2d 99, 102 (4th Cir. 1991).

The defendants rely on two written agreements to arbitrate: the April 2011 Contract and the 2012 Purchase Agreement. As to each, FCA concedes the existence of the first, third, and fourth elements but disputes the existence of the second element: a written agreement that includes an arbitration provision which purports to cover the dispute.

**1. The April 2011 Contract**

**a. Extension of the April 2011 Contract**

The April Contract, wherein TESA and FCA agreed that FCA would attempt to sell TESA to three listed potential buyers, contains an arbitration agreement. (Doc. 20-1 at 9.) However, the defendants' initial reliance on the April Contract is misplaced for two reasons: first, the April Contract had expired, and second, the arbitration provision in the April Contract does not cover the present dispute.

It is well-established that when a contract terminates by its own terms and the dispute between the parties did not arise out of that contract, then the arbitration clause in that contract does not come into play. *See Va. Carolina Tools, Inc. v. Int'l Tool Supply, Inc.*, 984 F.2d 113, 117 (4th Cir. 1993); *Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*, 850 F.2d 756, 762 (D.C. Cir. 1988) ("[P]arties must be able effectively to provide for the expiration or termination of their obligation to arbitrate . . . ."). That is the case here.

By its own terms, the April Contract was in effect for 90 days, (Doc. 20-1 at 9), and terminated in July 2011. (Doc. 7 at ¶ 7.) It specifically stated that "[t]his Agreement will be legally terminated due to the expiration of the [90-day] term . . . , unless the request for an

5

extension . . . is delivered and the extension agreement is executed by both parties." (Doc. 20-1 at 8.) It is undisputed that no party requested extension, and thus the April Contract terminated.

The October emails did not extend the April Contract. By its terms the April Contract had expired and the only method of extension authorized by the contract - stated twice, in Paragraph 9 and again in Paragraph 12 - was not followed. (*Id.* at 8-9.)

Moreover, the April Contract did not cover a sale of TESA's assets to the ultimate buyer, TESA Acquisitions, or any other defendant. The arbitration agreement in the April Contract did not purport to require arbitration of all disputes between the parties and was limited to "disputes or disagreements in the interpretation, compliance and performance of this agreement." (*Id.* at 9.) The April Contract only covered a sale to one of three other specifically named potential buyers. (*Id.* at 4.) Because the current dispute did not in any way arise out of the April Contract, which concerned other potential buyers and not AEC or TESA Acquisitions, the arbitration provision in the April Contract does not cover the instant dispute.

### b. Incorporation by Reference of the April Contract in the October Agreement

The defendants also contend that when the parties reached an agreement at the end of October for FCA to attempt to broker a sale to AEC, the terms of the April Contract were incorporated into that new agreement except as expressly modified by the October email exchange. While FCA agrees that it entered into a contract with TESA in October, it contends it had an oral contract, supplemented by the provisions of the October emails and the course of dealing, and that the April Contract was not incorporated by reference. Thus, there is a dispute between the parties as to the form and the terms of the October agreement.

"Incorporation by reference is proper where the underlying contract makes clear reference to a separate document, the identity of the separate document may be ascertained, and

6

incorporation of the document will not result in surprise or hardship." *Standard Bent Glass Corp. v. Glassrobots Oy*, 333 F.3d 440, 447 (3d Cir. 2003); *see also* 11 Richard A. Lord, *Williston on Contracts* § 30:25 (4th ed. 2011) ("As long as the contract makes clear reference to the document and describes it in such terms that its identity may be ascertained beyond doubt, the parties to a contract may incorporate contractual terms by reference to a separate, noncontemporaneous document, including a separate agreement to which they are not parties, and including a separate document which is unsigned."). On the other hand, the arbitration clause must be validly incorporated by reference,[1] and the defendants have cited no case for the proposition that one can enforce an oral agreement to incorporate an arbitration provision from a previous contract into a new contract, much less that one can enforce an implied agreement.

Arbitration agreements must be in writing to be enforceable under the Federal Arbitration Act. *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25 n.2 (1991) (citing 9 U.S.C. §§ 2,

---

[1] This issue arises in a number of contexts, and the most common are not particularly similar to the factual situation here. *See, e.g.*, *Logan & Kanawha Coal Co., LLC v. Detherage Coal Sales, LLC*, No. 12-1128, 2013 WL 1150490, at *4 (4th Cir. Mar. 21, 2013) (applying West Virginia law to hold that clear reference to the contract containing an arbitration clause incorporated the clause by reference despite minor differences between terms and conditions and that prior course of dealings, including plaintiff's use of the same arbitration provision on four occasions, overcame concerns of any resulting surprise or hardship to defendant); *R.J. O'Brien & Assocs., Inc. v. Pipkin*, 64 F.3d 257, 260 (7th Cir. 1995); *Maxum Founds., Inc. v. Salus Corp.*, 779 F.2d 974, 978 (4th Cir. 1985) (holding that in the construction law context an agreement to arbitrate may be validly incorporated into a subcontract by reference to an arbitration provision in a general contract); *Rashid v. U.S. Fid. & Guar. Co.*, No. 2:91-0141, 1992 WL 565341, at *7 (S.D.W. Va. Sept. 28, 1992) (holding and collecting cases for the proposition that sureties on construction performance bonds are bound by the arbitration provision in a general contract); *Park v. Merrill Lynch*, 159 N.C. App. 120, 126, 582 S.E.2d 375, 380 (2003) (holding that adoption agreement incorporated by reference IRA custodial agreement containing an arbitration provision where investors signed the adoption agreements, acknowledged receiving agreements that contained the arbitration provision, and stated that they agreed to arbitration); *Nordin v. Nutri/Sys, Inc.*, 897 F.2d 339, 345 (8th Cir. 1990) (holding that non-disclosure agreement containing a covenant not to compete did not specifically incorporate by reference arbitration clause in settlement agreement where the agreements were separate and independent documents and the disputed covenant not to compete did not contain an arbitration clause).

7

3). Here, the only possible writing is the October email exchange. Those emails, however, do not explicitly adopt all or indeed any of the terms of the expired April Contract, and no mention is made of arbitration. Thus, there is no written contract that includes an arbitration provision which purports to cover the dispute at issue.

The defendants contend a trial is needed, pursuant to 9 U.S.C. § 4, to determine whether there was an agreement to arbitrate. A trial is necessary to determine whether an agreement to arbitrate exists only if "the making of the arbitration agreement or the failure, neglect, or refusal to perform the same" is in issue. 9 U.S.C. § 4. Any oral agreement related to the incorporation of the April Contract would not suffice to make the arbitration provision in the April Contract enforceable. When there is "no genuine issue of fact concerning the formation" of the arbitration agreement, a court may decide as a matter of law that no agreement to arbitrate covers the disputed issue. *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 (3d Cir. 1980). Because there is no genuine issue of fact concerning whether the October email exchange contains an arbitration clause, a trial is not required.

**2. The Purchase Agreement**

In April 2012, TESA and TESA Acquisitions entered into the written Purchase Agreement, whereby TESA Acquisitions bought 80 percent of TESA's shares. The Purchase Agreement contained an arbitration provision. The Purchase Agreement also required TESA Acquisitions to "assume and agree to pay, perform and discharge . . . those liabilities and obligations . . . to be performed by [TESA]." (Doc. 20-3 at 4.)

In the complaint, FCA alleges that TESA Acquisitions is liable for TESA's breach of contract because under the Purchase Agreement, TESA Acquisitions assumed all of TESA's liabilities. (Doc. 7 at ¶ 20.) FCA further alleges in the complaint that AEC is liable for TESA's

breach because AEC asserted total ownership and control over TESA Acquisitions and improperly used TESA Acquisitions to avoid paying the commission. (*Id.* at ¶ 21.) FCA contends that this total ownership and control is sufficient to pierce AEC's corporate veil.

Defendants contend that arbitration of the dispute with FCA is required because FCA is relying on the terms of the Purchase Agreement for its claims against TESA Acquisitions and AEC and that in those circumstances FCA is equitably estopped from refusing to comply with the arbitration provision in the same contract it is trying to enforce. FCA contends that it did not sign the Purchase Agreement and is not a party to that agreement, which it contends was designed to cheat FCA out of its commission, and that under those circumstances estoppel is not fair. It is undisputed that FCA is not a signatory to the Purchase Agreement.

There are five theories, "'aris[ing] out of common law principles of contract and agency law,'" that may bind a non-signatory to an arbitration agreement: "'1) incorporation by references; 2) assumption; 3) agency; 4) veil piercing/alter ego; and 5) estoppel.'" *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 417 (4th Cir. 2000) (quoting *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995)). Equitable estoppel precludes a party from relying on the terms of a contract when it is advantageous to do so while simultaneously repudiating other terms of the contract that work to its detriment. *Wachovia Bank, Nat'l Ass'n v. Schmidt*, 445 F.3d 762, 769 (4th Cir. 2006); *see Long v. Silver*, 248 F.3d 309, 320 (4th Cir. 2001) (holding that plaintiff was equitably estopped from claiming benefits of shareholder status from a previous contract while at the same time seeking to avoid enforcement of an arbitration clause in that same contract). In other words, when a non-signatory seeks to deny the enforceability of an arbitration agreement, equitable estoppel prevents that party from "asserting that the lack of [its] signature on a written contract precludes

enforcement of the contract's arbitration clause when [it] has consistently maintained that other provisions of the same contract should be enforced" against the signatory. *Int'l Paper*, 206 F.3d at 418; *see also R.J. Griffin & Co. v. Beach Club II Homeowners Ass'n*, 384 F.3d 157, 161, 165 (4th Cir. 2004).

In the complaint, FCA relies explicitly on the Purchase Agreement, which, as noted *supra*, contains an arbitration provision, for its theory that TESA Acquisitions is liable for TESA's breach of contract. FCA alleges that "[u]nder the final terms of the Purchase [Agreement], [TESA Acquisitions] assumed all of TESA's liabilities, including TESA's contractual and equitable obligations to pay FCA." (Doc. 7 at ¶ 20). FCA further alleges that AEC is also liable, under the doctrine of piercing the corporate veil, "[b]ecause of AEC's total ownership and control of [TESA Acquisitions]." (*Id.* at ¶ 21.) This allegation also relies on the Purchase Agreement because without TESA Acquisitions' alleged assumption of TESA's liabilities under the Purchase Agreement, there is no corporate veil to pierce.

This is very similar to the facts in *Riek v. Xplore-Tech Services Private Ltd.*, No. 1:08CV117, 2009 WL 891914 (M.D.N.C. Mar. 31, 2009), in which Riek, the former president of Help Desk, had loaned money to Help Desk before Xplore-Tech agreed to purchase Help Desk from DP Solutions. Under the purchase agreement, which contained an arbitration provision and was signed by Xplore-Tech and DP Solutions, Xplore-Tech agreed to assume Help Desk's liabilities. *Id.* at *1. Riek sued for repayment of the loan and the defendants moved to compel arbitration. *Id.* The defendants contended that Riek was equitably estopped from avoiding the arbitration provision in the purchase agreement because in his complaint he alleged that "pursuant to the Share Purchase Agreement between Xplore-Tech and DP Solutions, . . . Xplore-Tech assumed the Loan and promised to repay it." *Id.* at *5. Based on this allegation in the

complaint, the court held that Riek was equitably estopped from avoiding arbitration because he sought a direct benefit from the purchase agreement by attempting to enforce terms of the agreement containing the arbitration provision in his claim for repayment. *Id.*

Similar to the allegations in *Riek*, FCA alleges that "[u]nder the final terms of the Purchase [Agreement], [TESA Acquisitions] assumed all of TESA's liabilities, including TESA's contractual and equitable obligations to pay FCA." (Doc. 7 at ¶ 20.) As in *Riek*, FCA's allegations in the complaint seek a direct benefit from the Purchase Agreement that contains the arbitration provision. The allegations in Paragraph 20 rely on the Purchase Agreement to establish liability against TESA Acquisitions. The allegations in Paragraph 21 likewise rely on the Purchase Agreement because they depend on TESA Acquisitions' alleged assumption of TESA's liabilities. Thus, FCA seeks to benefit from the Purchase Agreement by using it to establish liability against TESA Acquisitions and AEC. Stated another way, FCA can only recover against TESA Acquisitions and AEC if the Purchase Agreement is enforced. Accordingly, FCA is equitably estopped from "avoid[ing] the arbitration provision of the Purchase Agreement and at the same time enforc[ing] another contract provision that operates to his benefit." *Riek*, 2009 WL 891914, at *5.

FCA contends that the Purchase Agreement was not a contract directly benefitting FCA, but rather a sham transaction to avoid payment of the commission. FCA contends that because of the nature of the transaction and because the arbitration agreement was designed to harm FCA, it should not be equitably estopped from avoiding arbitration. However, this does not distinguish this case from *Riek*. In each case, the plaintiff wanted to enforce certain terms of the Purchase Agreement while avoiding that agreement's arbitration provision. *See id.* In each case, the plaintiff's allegations seek a direct benefit from the purchase agreement. *See id.*

11

Because FCA seeks a direct benefit from the Purchase Agreement by attempting to enforce some of its terms against the defendants, FCA is equitably estopped from denying enforcement of the arbitration provision in the Purchase Agreement.  Thus, arbitration of the underlying dispute is required, and Defendants' Motion to Compel Arbitration is granted.

### B. The Motion to Remand

Because FCA is equitably estopped from avoiding arbitration, this Court has federal question jurisdiction pursuant to 9 U.S.C. § 201 *et seq*.  Accordingly, FCA's Motion to Remand is denied.

### C. The Motion to Dismiss

Because arbitration is required, Defendants' Motion to Dismiss is for the arbitrators to decide.  It will be denied without prejudice.

It is **ORDERED** that:

1. Defendants' Motion to Compel Arbitration, (Doc. 18), is **GRANTED**.  The parties shall consult as to whether a stay pending arbitration or dismissal is more appropriate and shall advise the Court within fifteen days.
2. Plaintiff's Motion to Remand, (Doc. 26), is **DENIED**.
3. Defendants' Motion to Dismiss for Failure to State a Claim, (Doc. 16), is **DENIED** without prejudice to renewal before the arbitrators.

This the 25th day of June, 2013.

UNITED STATES DISTRICT JUDGE

12

Case 1:12-cv-01296-CCE-JLW   Document 49   Filed 06/25/13   Page 12 of 12